UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>,
    Government

    v.                      Case No. 14-cr-19-01/03-SM
                                   Opinion No. 2014 DNH 218
<u>Miguel Garcia, a/k/a "Migs,"</u>
<u>Robert Barter, a/k/a "Bobby," and</u>
<u>Janelle Evans, a/k/a "Nelle,"</u>
    Defendants

**O R D E R**

Defendants, Miguel Garcia, Robert Barter, and Janelle Evans move to suppress evidence they say was obtained during an unconstitutional search and seizure of their persons and an automobile belonging to Barter.  Having considered the evidence presented at a suppression hearing, the briefs filed by the parties, and the argument of counsel, the defendants' motions to suppress evidence (document nos. 26, 27, & 28) are granted.

**Findings of Fact**

On August 13, 2013, New Hampshire State Police K-9 Trooper Brian Gacek ("Trooper Gacek") stopped Janelle Evans, Miguel Garcia, and Robert Barter, residents of Maine, at approximately 4:34 a.m. on Interstate 95 North near Greenland, New Hampshire. Trooper Gacek testified that he witnessed the vehicle commit two traffic lane violations.

Trooper Gacek had been sitting in a marked cruiser in a parking area to the immediate right of the Hampton toll plaza, which is fairly well lit.  He testified that he was "bored" and "needed something to do" given the few cars on the road in the early morning hours.  He noticed a car registered in Maine, with what appeared to be a driver and a male passenger in the front seat, go through the toll booth.  The toll booth was some 50 to 75 yards from his position.  After the car paid the toll, it passed uneventfully within 10-15 feet directly in front of Trooper Gacek's cruiser.  Trooper Gacek, on a hunch,[1] pulled out of the parking lot and began following the car in the adjacent travel lane.  He continually maintained a position in or near the car's blind spot, to the left and rear — something he testified that he does often while on patrol.

Trooper Gacek followed the car in that position for approximately 3 miles without observing anything unusual.  Then, he says, the driver, Evans, drifted the vehicle slightly across the dashed white line into Trooper Gacek's travel lane, then back as the road curved.  As the road straightened out again, the car's right tires drifted over the solid white fog line on the right shoulder of the road.  Based on those minor traffic

---

[1] During the hearing, Trooper Gacek testified, among other things, that "in general, I'm suspicious of everything."

2

infractions, which Trooper Gacek said might suggest that the
driver was tired or impaired, he activated his blue lights and
pulled the car over.  He turned on his spotlight to illuminate
the area so he could better see what was in the car.  When the
spotlight was turned on, a second passenger sat up in the back
seat.

Trooper Gacek approached the car on the passenger side.  The
passenger window was open.  If he had not noticed before, when
the car had passed within 10-15 feet of him, Trooper Gacek could
then see that the driver was a Caucasian female and the
passengers were Hispanic males, at least one of whom, the front
seat passenger, displayed a number of tattoos.

Trooper Gacek asked the driver for her license and
registration, explaining that he had pulled her over for traffic
lane violations.  He saw no furtive movements, saw no weapons,
smelled no alcohol or marijuana, saw no drugs, and saw nothing
else that would lead him to suspect that any criminal activity
might be ongoing.

Evans told Gacek that she was tired.  She produced her
driver's license from her purse promptly and without any
difficulty.  Gacek observed that Evans seemed nervous and said

3

that her outstretched arm was shaking as she reached across the
passenger to hand him her license through the open window.  Evans
said she did not know where the registration was.  The front seat
passenger, Garcia, then reached into the glove compartment and
handed it to Trooper Gacek, without looking at him.  Garcia had
not looked at Trooper Gacek since he approached the vehicle —
something Trooper Gacek found odd.  Trooper Gacek testified that
he also thought Garcia was nervous, because, he said, Garcia's
hand was shaking to the extent that the paper registration
audibly fluttered.  Noticing that the car was registered to a
Robert Barter, not Evans, Trooper Gacek asked Garcia for his
identification.  Garcia handed him a Maine driver's license, his
hand still shaking according to Trooper Gacek.  The backseat
passenger identified himself as Robert Barter, and he also
produced a Maine driver's license.

Trooper Gacek asked the occupants where they had been and
where they were headed.  Evans told him that they had been in
Dorchester, Massachusetts, visiting Garcia's aunt who was dying
of cancer and that they were headed back to Bangor, Maine, to get
Garcia to work by 9:00 a.m.  According to Trooper Gacek,
Dorchester is a "known drug area."  Barter corroborated Evans'
response and added that he planned to go home to Baileyville,
some 2-3 hours north of Bangor, after dropping Garcia at work.

4

He also added that the trip to Dorchester was something of a test drive after he had replaced the car's drive shaft.

Trooper Gacek took the defendants' identification and returned to his cruiser. Gacek is a trained K-9 officer, and he had his canine partner in the cruiser. The car was pulled over at 4:34 a.m. Although Trooper Gacek testified he had already decided to issue Evans a warning for the traffic violations (by 4:47 a.m.), when he returned to the cruiser he radioed Trooper Matthew Locke for back-up assistance, based, he said, on the defendants' nervous behavior and Barter's odd (at least in Trooper Gacek's mind) statement that the trip was also a test drive. He simultaneously ran records checks on Evans, Garcia, and Barter. Trooper Gacek's initial records check disclosed that the vehicle was properly registered to Barter, that Evans held a valid driver's license, and that there were no outstanding warrants for Evans, Garcia, or Barter.

Although the initial records check revealed nothing suspicious, Trooper Gacek ran additional criminal history and police intelligence checks on the defendants by phone. He learned that Garcia had been identified in several police investigations involving drugs and firearms, and may have been affiliated with the Hell's Angels gang, and that Barter's name

5

had been mentioned in connection with several police drug
investigations.  Evans had no prior criminal history, and her
name apparently did not appear in any police intelligence
reports.

     At that point, now 4:53 a.m., Trooper Locke arrived.
Trooper Gacek gave Trooper Locke a brief explanation of what had
transpired.  He did not ask Trooper Locke to determine if Evans,
or anyone else, was impaired by drugs or alcohol, though Trooper
Locke was a certified drug recognition expert and that was
ostensibly the primary reason Gacek summoned him.  Before Trooper
Gacek returned to Barter's car, he electronically issued Evans a
warning, resolving the observed traffic lane violations for which
he stopped the car.  Approximately 19 minutes had passed since
Trooper Gacek pulled the car over.

     After issuing the warning, Trooper Gacek returned to the car
and told Evans to get out.  She complied.  Trooper Gacek
testified that he noticed no signs of possible impairment, and
Trooper Locke, standing a few feet away where he could hear them
talking, did not indicate to Trooper Gacek that he thought Evans
was impaired in any way.  Trooper Gacek told Evans he had given
her a warning for the traffic violations, but he did not release
her and the others to go about their business at that point.

Instead, he again asked her where she had come from and where she
was going.  Evans reiterated her earlier explanation except she
added that Barter was going to work in Bangor as well as Garcia.
She told Trooper Gacek that Garcia was her boyfriend, that she
had known Barter for only a couple of weeks, but that Garcia and
Barter had known one another for years.  At some point, Trooper
Gacek asked Evans if there were drugs in the car.  She denied
that there were.

Trooper Gacek then ordered Garcia out of the car.  Trooper
Gacek patted Garcia down for weapons but found nothing.  Trooper
Gacek testified that "[e]verybody who gets out of a vehicle with
my shift at night, we typically pat down."  The pat-down
apparently irritated Garcia, who seemingly was already upset by
Gacek's attention since he was not the operator of the car, and
the stop supposedly related to traffic infractions.  Trooper
Gacek testified that while he tried to talk with Garcia, Garcia
shifted his weight from one foot to the other and turned his body
on an angle in what Gacek characterized as "blading" or a "fight-
or-flight stance."  Trooper Gacek also testified that Garcia
yelled that the police had no reason to talk with him because he
was not driving and had not committed any lane violations.  Under
questioning, Garcia confirmed that they had been in Dorchester

7

visiting his sick aunt and denied there were illegal drugs in the car.

Trooper Gacek then directed Barter to get out of the car. Trooper Gacek patted him down as well, finding nothing.  Trooper Gacek again questioned Barter about where they had come from and where they were going.  Barter confirmed Evans' earlier explanation that they had been in Dorchester visiting Garcia's sick aunt and were headed to Bangor.  He also reiterated that he'd recently changed the drive shaft in his car.  He then said that he was going to work construction with Garcia in Bangor, a slight (by Gacek's own account), but not irreconcilable, difference from his original statement that he was going home after dropping Evans and Garcia in Bangor.  When Trooper Gacek asked if he always worked with Garcia, Barter responded, "Sometimes."  When Trooper Gacek pressed the point — that Bangor was a 2-3 hour drive from Barter's home, Barter did not respond. He denied having drugs in the car when Trooper Gacek asked. Barter, too, shifted his weight from side to side, stood at an angle, and talked with his hands, but otherwise had a civil conversation with Trooper Gacek, and did not appear nervous.

Trooper Gacek testified that it was approximately 5:05 a.m. when he finished questioning Barter, at which time he asked

Barter for consent to a search his vehicle.  Barter refused
consent to search, claiming that nothing illegal was in the
vehicle.  Trooper Gacek then advised Barter that while he was
free to refuse consent, if he refused, then Trooper Gacek would
run his canine partner around the car.  Trooper Gacek added that
if the dog alerted to the presence of narcotics, Gacek would then
seize the vehicle, obtain a search warrant, and in the meantime
would transport Evans, Garcia, and Barter off the highway to find
their own way home.  Barter again refused consent to search.
Barter became more animated and loud, telling Trooper Gacek that
a search was ridiculous because there was nothing in the vehicle.
Trooper Gacek returned to the car, shut it off, and rolled up the
windows.

     Shortly thereafter Trooper Gacek retrieved his canine and
walked the dog around the car twice.  Gacek says the dog alerted
to the front passenger wheel by scratching and reaching its head
into the wheel well.  The dog then moved on and became excited
along both the driver and passenger side of the vehicle.  The
time was approximately 5:10 a.m. — some 17 minutes after he
issued Evans the warning.

     Trooper Gacek returned his dog to the cruiser and
reapproached Garcia, Barter, and Evans.  Trooper Gacek again

9

asked Barter to consent to a search.  Barter declined and
contested whether the canine had positively alerted, because the
drug dogs with which he was familiar sat when they smelled drugs
instead of barking or scratching as Gacek's dog had done.
Trooper Gacek explained to Barter that his dog was an "active
alert" canine and therefore behaved aggressively, rather than
sat, when he detected the presence of narcotics.  Because the dog
alerted, giving rise to probable cause to believe that illegal
drugs were Trooper Gacek informed all three defendants that he
had no choice but to seize the car and obtain a search warrant.
Trooper Gacek explained that Trooper Locke would give all three a
ride off the highway so that they could arrange for a ride home.
In response, Barter reluctantly consented to a search.

     Trooper Locke reviewed a consent to search form with Barter.
During that review Trooper Locke again advised Barter that he had
the right to refuse a search of his vehicle.  Barter completed
and signed the form at 5:15 a.m.  Forty-one minutes had elapsed
since Trooper Gacek stopped the vehicle, and at least 22 minutes
had elapsed since he issued the electronic warning to Evans for
the traffic violations.

     With Barter's written consent in hand, Trooper Gacek began
to search the vehicle.  In a purse belonging to Evans, Trooper

10

Gacek found a heroin kit containing needles, Q-tips, and a strap (utilized to inhibit circulation).  Under the back seat, Trooper Gacek found a black plastic bag that contained several hundred individual baggies of what was believed to be heroin.  Because Trooper Gacek and Trooper Locke recovered controlled substances, Garcia, Barter, and Evans were arrested and transported separately to the Rockingham County Jail.  The total time from the beginning of the traffic stop to the K-9 dog's alert was approximately 41 minutes.

The defendants were each charged with one count of conspiracy to distribute and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

The defendants moved to suppress the evidence as the product of an unconstitutional seizure and search.  The court held a hearing on the defendants' motions on June 23, 2014.

### Discussion

Defendants challenge the legality of the initial traffic stop, their detention, and the search.  They seek to suppress all inculpatory evidence derived from that search.[2]

---

[2] As a preliminary matter, Evans, Garcia, and Barter have standing to move to suppress the inculpatory evidence offered against them as the fruit of an illegal detention.  "The fact

A traffic stop and detention of an automobile's occupants is a seizure under the Fourth Amendment.  United States v. Jones, 700 F.3d 615, 621-22 (1st Cir. 2012) (citing Whren v. United States, 517 U.S. 806, 809-10 (1996)).  All such seizures must be "reasonable," U.S. Const. Amend. IV, and police officers conducting an investigatory stop must have "reasonable suspicion" that criminal activity is afoot.  Jones, 700 F.3d at 621.  An officer "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' justify an intrusion on a private person." Id. (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).  Officers' "hunches," unsupported by articulable facts, cannot substitute for reasonable suspicion. Id. (quoting Terry, 392 U.S. at 22).

---

that a defendant is a passenger in a vehicle as opposed to the driver is a distinction of no consequence in this context." United States v. Kimball, 25 F.3d 1, 5-6, n.3 (1st Cir. 1994); see also Brendlin v. California, 551 U.S. 249, 251 (2007) (holding that a passenger in a car is seized along with the driver when the car is stopped by the police and has standing to challenge the constitutionality of the stop); United States v. Starks, No. 13-1251, 2014 U.S. App. LEXIS 19211, at *15-*16 (1st Cir. Oct. 8, 2014) (confirming that a passenger has standing to challenge the constitutionality of a seizure resulting from a traffic stop); United States v. Mosley, 454 F.3d 249, 262-69 (3d Cir. 2006) (suppressing evidence offered against a passenger illegally detained); United States v. Jones, 234 F.3d 234, 244 (5th Cir. 2000) (suppressing evidence against the driver and the passenger of a car who were unlawfully detained after the legitimate purpose of stop was completed because the driver's consent was not sufficiently attenuated from the illegal detention to be purged), abrogated on other grounds by United States v. Pack, 612 F.3d 341 (5th Cir. 2010).

When deciding whether an officer had reasonable suspicion warranting a brief investigatory detention, a court looks to the facts "available to the officer at the moment of the seizure or the search."  Id.  A court then must assess the "totality of the circumstances" to see whether the officer had a particularized, objective basis for his or her suspicion.  Jones, 700 F.3d at 621 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002); see also United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006)); United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005).

In United States v. Chhien, the First Circuit described the nature of "reasonable suspicion":

> Reasonable suspicion, as the term implies, requires more than a naked hunch that a particular person may be engaged in some illicit activity.  By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime.  Reasonable suspicion, then, is an intermediate standard — and one that defies precise definition.  Its existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances.  In mulling those circumstances, an inquiring court must balance "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion."  To keep this balance true, the court must make a practical, commonsense judgment based on the idiosyncracies of the case at hand.

266 F.3d 1, 6 (1st Cir. 2001) (citations omitted).

Courts usually, if not always, confront Fourth Amendment
questions such as those raised in this case only after law
enforcement has seized inculpatory evidence and a person has been
criminally charged.  This is so because "freedom from
unreasonable search differs from some of the other rights of the
Constitution in that there is no way in which the innocent
citizen can invoke advance protection." Brinegar v. United
States, 338 U.S. 160, 182 (1949) (Jackson, J. dissenting).
Rather, "[c]ourts can protect the innocent against such invasions
only indirectly and through the medium of excluding evidence
obtained against those who frequently are guilty." Elkins v.
United States, 364 U.S. 206, 218 (1960) (quoting Brinegar, 338
U.S. at 181).  "As Justice Scalia has written for the Court,
'there is nothing new in the realization that the Constitution
sometimes insulates the criminality of a few in order to protect
the privacy of us all.'" United States v. Khounsavanh, 113 F.3d
279, 285 (1st Cir. 1997) (quoting Arizona v. Hicks, 480 U.S. 321,
329 (1987)).

Our court of appeals has recognized that "[w]hat emerges
from these resounding declarations is the rule that even where
there are present the very great interests of society first, in
adjudging the conduct of a defendant charged with the most
reprehensible crimes, and, second, in disabling him, if guilty,

14

from continuing as a menace to the peaceful existence of the rest of us, nonetheless unconstitutionally seized evidence may not be used to convict him.  The safety of our society depends more upon the preservation of fundamental liberties than upon the punishment of a person whose offense we can prove only through subverting those liberties." <u>Berkowitz v. United States</u>, 340 F.2d 168, 170-171 (1st Cir. 1965).

Turning to the seizure at issue here, "review of a <u>Terry</u> stop involves a two-step analysis." <u>United States v. Mouscardy</u>, 722 F.3d 68, 73 (1st Cir. 2013).  The court must first "ascertain whether the stop was justified at its inception" and second "determine whether the actions undertaken during the stop [were] reasonably related in scope to the stop itself unless the police [had] a basis for expanding their investigation." <u>Id.</u> (internal citations and quotations omitted) (alterations in original).

In the context of a traffic stop, the Supreme Court has held that the "'[t]emporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop,' ending 'when the police have no further need to control the scene.'" <u>United States v. Fernandez</u>, 600 F.3d 56, 60 (1st Cir. 2010) (quoting <u>Arizona v. Johnson</u>, 129 S. Ct. 781, 788 (2009).  Further, an "officer's inquiries into matters unrelated

15

to the justification for the traffic stop do not convert the
encounter into something other than a lawful seizure, so long as
those inquiries do not measurably extend the duration of the
stop." Id. (citations omitted).


Even a minor traffic violation, like the lane violations
here, will justify an officer in conducting a traffic stop. Topp
v. Wolkowski, 994 F.2d 45, 48 (1st Cir. 1993); United States v.
Levesque, No. 94-cr-120, 1995 U.S. Dist. LEXIS 10349, at *12
(D.N.H. July 11, 1995).  In this case, the uncontradicted
evidence establishes that Evans crossed over the dashed line to
the left of her travel lane and then over the solid white fog
line to the right.  Trooper Gacek's following of Evans for some
three miles in a marked cruiser while maintaining a continuous
position in her blind spot is, of course, a kind of police
behavior very likely to make even the most innocent driver
nervous and fretful, and that tactic may well have induced a
measure of distraction leading to the lane violations in this
case.  And Trooper Gacek's view that the lane violations might
have suggested impairment or fatigue is of course substantially
weakened by the more plausible explanation that his own driving
tactics actually caused the driver's slight erratic operation.
(One might suppose that if a private citizen followed a cruiser
in that manner — if the roles were reversed — the officer would

16

be understandably irritated and his or her operation might well
be affected as well.)

Trooper Gacek, for the purpose of resolving defendants'
motions, acted within the law (no party has raised an issue with
respect to whether Trooper Gacek's tailing defendants with his
cruiser violated any New Hampshire traffic laws).  Gacek was,
then, justified in concluding that, even if induced by his own
driving tactics, still, Evans had committed a traffic violation,
and a traffic stop was legally permissible.  See N.H. Rev. Stat.
Ann. 265:24.  Consequently, the first prong of the two part test
is satisfied – the initial detention of the car and its occupants
was justified at its inception.[3]

The government does not argue, of course, that the delay
attributable to police activities after Trooper Gacek issued
Evans the traffic warning was time reasonably related to the

_____

[3] Based on precedent in this circuit, it was also reasonable
for Trooper Gacek to take and run Garcia's and Barter's
identification.  Once it became clear that Evans was not the
owner of the car, Trooper Gacek had reason to ask for passenger
identification to determine if either was the record owner of the
car.  See United States v. Henderson, 463 F.3d 27, 46 (1st Cir.
2006) (it might be reasonable to ask for passenger identification
to determine if the passenger was a licensed driver).  Since
obtaining identification and running criminal history checks on
the driver and passengers extended the stop by only about 5
minutes, they did not unduly extend the time of the traffic stop.
See United States v. Fernandez, 600 F.3d 56, 61-63 (1st Cir.
2010); United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009).

traffic stop.  So, the next issue becomes whether the additional
detention of approximately 17 minutes between Trooper Gacek's
issuing the warning and his running the drug dog around the
detained vehicle "measurably extend[ed] the duration of the
stop," or, alternatively, was justified by reasonable suspicion
that criminal activity was afoot.

A seizure justified solely by the state's interest in
issuing a traffic warning ticket to a driver "can become unlawful
if it is prolonged beyond the time reasonably required to
complete that mission." Illinois v. Caballes, 543 U.S. 405, 407
(2005).  In United States v. Henderson, for example, the court of
appeals for this circuit held that extending a traffic stop for
20 minutes to run a criminal history check on a passenger in a
stopped car, without any particularized reason to prolong the
stop, measurably (and impermissibly) extended the duration of the
stop.  United States v. Henderson, 463 F.3d 27, 46-47 (1st Cir.
2006).  The court there held that the extended investigation
violated the Fourth Amendment because there was "no
particularized reason" to suspect that criminal activity besides
the traffic violation was afoot justifying the officer to "launch
into an investigation" of the passenger.  Id.; see also United
States v. Boyce, 351 F.3d 1102, 1105, 1107-11 (11th Cir. 2003)
(holding that a 12 minute delay to investigate a car for

18

narcotics without reasonable suspicion for doing so was not
reasonable).

Precedent invoked by the government, in which traffic stops
prolonged between 40 and 90 minutes were held reasonable, do not
suggest otherwise.  In each of those cases the critical issue was
whether the additional delay was supported by reasonable
suspicion, and, on the facts of each case, the courts held that
it was.  Here, as in _Henderson_, I find that the approximately 17
minutes Trooper Gacek prolonged the traffic stop did measurably
extend the duration of the traffic stop beyond what was necessary
to resolve the minor lane violations at issue.  The extended stop
was constitutionally reasonable, then, only if it was based upon
reasonable and articulable suspicion that criminal activity was
afoot.

At the suppression hearing, Trooper Gacek candidly conceded
that Evans, the driver, had no trouble pulling over, and that
neither her operation of the vehicle nor her interaction with him
disclosed any indicia of impairment.  Evans was validly licensed;
no smell of alcohol or marijuana emanated from the car or its
passengers; no statements made by the occupants or observations
by Gacek suggested that there might be illegal drugs in that car
at that time; no one in the car made any furtive or suspicious

19

movements; no weapons were observed; the owner of the car was present; and there were no outstanding warrants for anyone in the car.  Trooper Gacek testified that after he issued the traffic warning, his reasonable suspicion to detain the defendants to further question them and run his drug dog[4] was based on: (1) Evans' and Garcia's unusually nervous behavior; (2) Barter's statement that he had replaced his drive shaft and part of the purpose of the trip was to take his car for a test drive; and (3) Garcia's and Barter's apparent prior drug involvement.  Those factors, taken together without more, do not constitute "specific and articulable facts" giving rise to a particularized, objective basis for Trooper Gacek's suspicion that the vehicle contained illegal drugs at that time, or that the occupants were involved in illegal drug activity.

The court of appeals has confirmed that nervousness during a traffic stop, even in a high-crime neighborhood, is not enough by itself to establish reasonable suspicion, and with good reason. United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005).  As the court explained, "Nervousness is a common and entirely natural reaction to police presence . . ." and it cautioned lower courts

---

[4] Trooper Gacek probably could have lawfully run the drug dog around the car during the traffic stop, so long as that activity did not extend the duration of the stop beyond the time reasonably necessary to resolve the purpose for the stop.  But he did not do so.  See Caballes, 543 U.S. at 407-09.

against admitting evidence that could lead to the "legal determination that if one commits a traffic violation in a high-crime neighborhood he will be subject to a frisk whenever he appears nervous and moves." Id. at 41. Similar caution should be exercised in this case, particularly given Trooper Gacek's own nervousness-inducing conduct in deliberately tailing the car in its blind spot for over three miles.

Although Trooper Gacek testified that, in his view, the defendants were more than normally nervous when they handed him their licenses and registration, that perception was undoubtedly enhanced by Trooper Gacek's own likely nervousness — it was very early in the morning, no other cars were on the road, and Trooper Gacek was stopping a car with multiple occupants, including two rough looking men whom he later learned had had some involvement with illegal drugs. Trooper Gacek's memory of the degree of manifested nervousness no doubt was colored by those circumstances, and he of course should have expected more than a modicum of nervousness given his own driving tactics.

While it is true, as the government points out, that nervousness "is a relevant factor to be considered along with others in assessing the totality of the circumstances," United States v. Mouscardy, 722 F.3d 68, 76 (1st Cir. 2013), in this

21

case, the other factors, even combined with nervousness, do not
add up to a "particularized, objective basis" to suspect the
presence of illegal drugs in the car.  In this circuit, extreme
nervousness plus a litany of other factors – a vehicle parked in
a parking lot surrounded by people loitering in a high-crime
area; a driver making furtive movements as if to conceal
something as an officer approached; an officer conducting a drug
investigation; an officer who had seen the suspect many times
before when he had not exhibited nervousness — has been found to
provide reasonable suspicion for a <u>Terry</u> stop.  <u>United States v.</u>
<u>Taylor</u>, 511 F.3d 87, 92 (1st Cir. 2007).  And, in the context of
a domestic violence investigation, a suspect's nervousness plus
his refusal to identify himself and further refusal to remove his
hand from his pocket when told to do so by the police, has been
held to constitute reasonable suspicion.  <u>Mouscardy</u>, 722 F.3d at
75-76.  In <u>United States v. Chaney</u>, the defendant exhibited a
nervous demeanor and, after stating that he left his
identification at home, said he could not remember what
jurisdiction issued it, could not recall the last four digits of
his Social Security number, and could not recall his address.
<u>United States v. Chaney</u>, 584 F.3d 20, 22 (1st Cir. 2009).  This,
the court held, in addition to the fact that his friend could
only identify him as "Jake" notwithstanding her claim to have
known him for five years, provided the officer with reasonable

suspicion that the defendant had given a false name and that criminal activity was afoot.  Id. At 23, 27.  Those cases are all distinguishable on their facts.

The out of circuit cases cited by the government are no more helpful.  For example, in United States v. White, in addition to the driver's nervous demeanor, he told the officer he was going home to Indiana while the rental contract stated that the rental car he was driving was due back in Las Vegas the next day.  584 F.3d 935, 942 (10th Cir. 2009).  That stark inconsistency gave rise to reasonable suspicion warranting continued detention after the issuance of a warning.  See id. at 952.  Similarly, in United States v. Riley, the defendant not only appeared nervous, but also said he did not remember what time he left the casino where he had been, or the name of the hotel where he had stayed, or what floor he had stayed on, and he lied about his criminal record.  684 F.3d 758, 763 (8th Cir. 2012).  The other cases cited by the government are likewise factually distinguishable from this case.

I conclude that while the defendants were certainly nervous — under the circumstances described even the most innocent and self-confident person would be expected to exhibit clear signs of nervous anxiety — their nervous manifestations were not so

23

remarkable under the circumstances as to warrant some particular
suspicion of ongoing wrongdoing, especially, again, given that
Trooper Gacek likely knew that his own conduct (extended tailing)
would likely induce a fair measure of nervousness in any driver
or passenger subsequently pulled over.  Thus, defendants'
nervousness, without more, did not provide Trooper Gacek with
reasonable articulable suspicion to extend the traffic stop for
another 20 minutes after he issued the traffic warning fully
resolving the ostensible purpose of the stop.  See McKoy, 428
F.3d at 40-41.


     On a different point, Barter's comment that he had done work
on his car and that the trip also served as a test drive, while
odd, is not of the sort, like those discussed in the above-cited
cases, that would permit a reasonable inference that general
criminal activity, or specific drug-related criminal activity,
was afoot.  Barter was not one of the individuals allegedly
exhibiting nervousness, and nothing was offered to show that
Barter's comment was either untrue or implausible.  That someone
of greater caution might never take a trip with a newly installed
drive shaft does not mean that one who does is potentially
engaged in criminal activity.  Besides, Trooper Gacek fully
understood that that was not the reason given for the defendants'
presence on the highway — no one suggested that they were driving

24

at 4:30 a.m. literally to test a drive shaft, and Trooper Gacek did not understand the comment in that manner, nor should it be taken in that context.

And, while both troopers testified about their perception related to so-called "blading" by Garcia and Barter, nothing described by them suggested anything but irritation on defendants' part — certainly neither defendant was said to have engaged in openly hostile or threatening behavior toward the officers, and the psychological gloss placed on their posture was neither developed nor supported by expert testimony or evidence. "Blading" did not add anything in support of articulable suspicion of drug activity.

Trooper Gacek testified that he also considered Garcia's and Barter's prior apparent involvement with illegal drugs, a fact that neither Barter nor Garcia contested or misrepresented. Those facts, even taken together with some nervousness, are simply not enough to constitute a "particularized, objective basis" for Trooper Gacek's suspicion that the car contained illegal drugs.  He had a hunch — and the hunch proved correct, but he did not have reasonable and articulable suspicion of drug activity.

The Tenth Circuit has also expressly rejected the notion that a defendant's nervousness, briefly misstating where he rented his car, and his having prior drug convictions (about which he did not lie) is enough to support a reasonable and articulable suspicion of criminal activity. <u>United States v. Wood</u>, 106 F.3d 942, 946-48 (10th Cir. 1997). The court in <u>Wood</u> further cautioned that if the law were such that a prior criminal record automatically gave rise to reasonable suspicion, "any person with any sort of criminal record . . . could be subjected to a <u>Terry</u>-type investigative stop by a law enforcement officer at any time without the need for any other justification at all." <u>Id.</u> at 948 (quotation marks and citations omitted). <u>Terry</u> does not extend that far.

During the suppression hearing, Trooper Gacek understandably and candidly testified that he is "suspicious of everything" when on duty, and he conceded that sometimes he is even "suspicious when [he doesn't] have anything to be suspicious about." That approach no doubt serves police and detective work well, but an officer's subjective suspicions and hunches are of course insufficient to justify a <u>Terry</u>-stop. More is needed: the particularized suspicion of an objectively reasonable officer. <u>See</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996). Under that standard, given the totality of circumstances, the extended

duration of the stop in this case crossed the line.  While the initial stop was legally justified at its inception, the continued detention after complete resolution of the minor traffic issues until development of probable cause by means of the drug dog sniff, was unsupported by reasonable and articulable suspicion of criminal activity.[5]

In this case, once Trooper Gacek gave the driver an appropriate sanction — a warning — 19 minutes into the stop, the purpose of the traffic stop was completed.  The defendants should have been released.  Trooper Gacek impermissibly and measurably extended the traffic stop by approximately 17 more minutes, persisting in his earlier attempts to develop reasonable

---

[5] The government rightly does not rely on Barter's subsequent consent to justify the search but on the earlier development of probable cause as provided by the dog's alert. While the government is right that the alert provided probable cause to search, that begs the question whether the alert was timely.  See, e.g., United States v. Quinn, 815 F.2d 153, 163-64 (1st Cir. 197) (Bownes, J. dissenting) (providing that the defendant's consent was not valid because its "causal connection" to the illegal detention was not broken) (citing Florida v. Royer, 460 U.S. 491, 503 (1983); Dunaway v. New York, 442 U.S. 200, 215-16 (1979); Brown v. Illinois, 422 U.S. 590, 605); United States v. Ocheltree, 622 F.2d 992, 994 (9th Cir. 1980)); United States v. Mosley, 454 F.3d 249, 268-69 (3rd Cir. 2006) (suppressing evidence causally related to an illegal traffic stop); United States v. Jones, 234 F.3d 234, 244 (5th Cir. 2000) (suppressing evidence because consent was not sufficiently attenuated from the illegal detention to be purged of its taint), abrogated on other grounds by United States v. Pack, 612 F.3d 341 (5th Cir. 2010); United States v. Dortch, 199 F.3d 193, 197, 202 (5th Cir. 1999) (same), abrogated on other grounds by United States v. Brigham, 382 F.3d 500 (5th Cir. 2004).

suspicion before he ran his drug dog.  This decision, "founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice."  Mapp v. Ohio, 367 U.S. 643, 660,81 (1961).

The evidence against Evans, Garcia, and Barter seized by Troopers Gacek and Locke on August 3, 2013 must be, and is, suppressed.

### Conclusion

For the reasons given, defendants' motions to suppress evidence (document nos. 26, 27, & 28) are granted.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 9, 2014

cc: Terry L. Ollila, AUSA
    Jonathan R. Saxe, Esq.
    Michael J. Iacopino, Esq.
    James D. Gleason, Esq.
    U.S. Marshal
    U.S. Probation